**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00494-02 (RC)** |
| **v.** | : | |
| | : | |
| **WILLIAM JASON SYWAK,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence William Jason Sywak to 45 days' incarceration, 3 years' probation, 60 hours of community service, and $500 restitution.

**I.     Introduction**

The defendant, William Jason ("Billy") Sywak, a 28-year-old welder from Arcade, New York, participated along with his father and co-defendant William Michael ("William") Sywak[1] in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[2]

---

[1] William Michael Sywak has also pleaded guilty and is scheduled to be sentenced on the same date and time as the defendant. The government will submit a separate sentencing memorandum relating to his case. For clarity, the government will refer to William Jason Sywak as "Billy Sywak," which is believed to be the first name he uses for himself, and William Michael Sywak as "William Sywak."

[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol exceeded 2.7 million dollars. That amount reflects, among other things, damage to

On February 2, 2022, Billy Sywak pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 45 days' imprisonment, with 3 years' probation to follow, is appropriate in this case because Billy Sywak: (1) anticipated violence between the supporters and opponents of former President Trump on January 6 and expressed a desire to join it if it occurred; (2) climbed the scaffolding on the Upper West Plaza to take in the chaos and violence; (3) entered the Capitol Building after watching other rioters assault law enforcement officers, smelling tear gas, and seeing billows of smoke rise in the crowd on the West Plaza; (4) overlooked numerous red flags in entering the Capitol to prove that "they work for us lol[;]" (5) was in the midst of rioters who hurled epithets of "traitors" at the officers who vainly attempted to prevent the mob from entering the Capitol; (6) followed closely on the heels of the mob of rioters who breached two separate line of police, allowing him to enter the Capitol Building after others had recently shattered windows at the Senate Wing Door; (7) was part of a group of rioters who faced off with police officers in the Crypt, then pushed past the line of officer to move further inside the building; (8) celebrated the events as "awsome" [sic] in the days after the attack; and (9) minimized the seriousness of his misconduct and laid blame on the besieged peacekeeping force by claiming the police let him enter the Capitol building.

The Court must also consider that Billy Sywak's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to delay the Congressional

---

the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

certification vote. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). Here, Billy Sywak's participation in a riot that actually succeeded in halting the certification vote, combined with his celebration and endorsement of the violence on that day, renders a modest but meaningful jail sentence both necessary and appropriate.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 34 (Statement of Offense), at ¶1-7. A riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Billy Sywak's conduct and behavior on January 6.

### The Sywaks' Role in the January 6, 2021 Attack on the Capitol

About a week before then-President Trump's "Stop the Steal" rally, William Sywak and his son Billy Sywak made plans to travel together to Washington, DC, for the event. As Billy Sywak later reported to the FBI, he and his father were not very close, and saw this as an opportunity to spend time together. They drove from upstate New York, leaving on January 5, 2021.

On the afternoon of January 5, Billy Sywak exchanged text messages with his fiancée about the rally. Those text messages suggest that Billy Sywak was eager to engage in violence against the opponents of former President Trump. At 12:22 pm his fiancée warned, "someone is saying that people are dressing up as Trump supporters and s**** going down so make sure you f***** whack someone real good if they hurt you with my GoPro[.]" When she reiterated, "better wack

3

them with the stick[,]" Billy Sywak responded, "Fuck yeah they will get knocked the fuck out with it an my dad won't fuck around either. My dad has friends we will meet up with an have a little group[.]"

That afternoon, his fiancee warned Billy Sywak that the National Guard had already been called in, and suggested he bring a map because Google was "shut down" in D.C. At 2:57 pm on January 5, she texted Billy Sywak, "It's going down tomorrow. If they don't recount an [sic] he not my president I'm gonna lose my shit again." Billy Sywak responded, "President isn't going to hand it over when there is fruad [sic] I'm so pumped…"

William and Billy Sywak stopped for the night at a hotel in Somerset, Pennsylvania. They did not make as much progress driving as Billy had hoped, and he texted his fiancée his annoyance. The next morning, on January 6 at around 8:03 am, he told her they had more than three hours to drive and he was worried they would miss everything. Then around 10:00 am, he got pulled over. According to Billy, the police officer who pulled him over saw weed residue on his pants and "asked if I had anything an being honest goes along way. Told him I had 8th of bud an wax card an knife in door an we we[r]e going to trump rally." The officer let them go with a warning. By around 12:35 pm, they had parked and were on their way to the Capitol. Video footage obtained from William Sywak's cell phone shows that they approached the Capitol from Pennsylvania Avenue at around 12:55 pm, along with a crowd of others.

On January 6, the father and son made their way to the West Plaza outside the U.S. Capitol building, shown on the diagram below and indicated by the red arrow:



*Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021*

To get to the West Plaza, the Sywaks would have walked over trampled fencing and bike rack-style barricades, which had been set up to surround the Capitol and ensure protestors knew that even the Capitol grounds were off-limits.

As they approached the Capitol, Billy Sywak took note of the crowd. At 1:18 pm, he texted his fiancee, "Alot of ppl are still showing up[.] Starting to fill they are expecting about 2million ppl[.]" At 1:25 pm, he observed, "Ppl are pissed." His fiancée responded, "I'm sure they are. It's not going to be pretty if he subway [sic] get reelected." At 1:29 pm, she added, "Love you throw hands for me if u have to." During this time, the crowd had swollen, overwhelming the U.S. Capitol Police and growing violent. The crowd had broken through several police lines and taken over the Upper West Plaza. Reinforcements from the D.C. Metropolitan Police Department (MPD) arrived

at around 1:15 pm, and helped to push back the crowd and re-gain some ground, but their position was precarious and the mob was angry and violent. Smoke, pepper spray, and angry shouts filled the air. At the moment his fiancée sent her text asking Billy Sywak to "throw hands for" her if he had to, U.S. Capitol Police and MPD officers were struggling to defend against the mob on the Upper West Plaza, as shown below:



The Sywaks pressed forward toward the police line. As they went, video footage taken by others at the riot—near the northwest scaffolding set up on the steps next to the Upper West Plaza (available at https://www.youtube.com/watch?v=wUmomtBJg0U and shown in still shots below)—shows the Sywaks were surrounded by people, smoke, and the sound of explosions. Both Sywaks appeared to be filming the events with their cell phones, while covering their faces to shield themselves from the smoke and pepper spray.



*Screenshot of video posted by Youtube user "Remember45," available at*
*https://www.youtube.com/watch?v=wUmomtBJg0U, at 47:08*



*Screenshot of video posted by Youtube user "Remember45," available at*
*https://www.youtube.com/watch?v=wUmomtBJg0U, at 47:11*

Video footage recovered from Billy Sywak's cell phone appears to have been taken around this

time, and shows the chaos up close from the Sywaks' perspective. *See* Exhibit 1 (Video on West

Plaza, from Billy Sywak's phone). People can be heard shrieking and seen covering their faces from the chemicals. The crowd can be heard taunting the police with the chant, "You swore an oath!" In one excerpt from this video, shown below, rioters pushed against the police line—a scene just like many that the Sywaks would have seen over and over again throughout the afternoon.



*Excerpt from Exhibit 1*

Video footage recovered from William Sywak's cell phone similarly shows the intensity of the crowd. The Sywaks saw rioters wearing battle gear, gas masks, ballistic vests, fatigues, and helmets. William filmed one scene, which metadata suggests was taken at 2:10 pm, as Billy was perched on the scaffolding, as shown below. *See* Exhibit 2 (Video of West Plaza and NW scaffolding, from Michael Sywak's phone).



*Excerpt from Exhibit 2*

The footage Billy Sywak took from that vantage point appears to have been recovered from text messages he sent to a friend later, excerpted below. *See* Exhibit 3 (Video from NW scaffolding perch, from Billy Sywak's phone). The police can be seen fighting against the crowd and using crowd control methods to attempt to re-gain order. Rather than retreating, the Sywaks advanced.



*Excerpt from Exhibit 3*

In another video from William Sywak's phone, rioters can be heard yelling and encouraging others to push through the scaffolding to climb the stairs up toward the building's entrance. *See* Exhibit 4 (Video of the NW stairs, from William Sywak's phone). The Sywaks followed the mob to the breach point, up the stairs inside the northwest scaffolding that had been constructed as part of the Presidential Inauguration preparations. William Sywak filmed as they pressed forward to squeeze through the opening with the mob, as shown below.

10



*Excerpt from Exhibit 4*

At the top of the stairs, another police line had recently fallen, so the Sywaks were able to reach the Upper West Terrace. A documentary film crew captured them among a crowd taunting a small group of police officers attempting to guard one of the doors, calling them "traitors!" The Sywaks smiled and looked on as the crowd jeered. *See* Exhibit 5 (Excerpt from documentary film crew footage).



*Excerpt from Exhibit 5*

Just yards away, at around the very same time, the Capitol was first breached by rioters

who broke the windows next to the Senate Wing Door and jumped through the broken glass:



William and Billy Sywak were just five minutes behind the very first rioters to breach the building.

They were at the forefront of the siege of the U.S. Capitol. As the Sywaks approached the building,

other rioters kicked open the doors. The Sywaks walked through the doors as others jumped

through the windows on either side. Loud, high-pitched, continuous alarms, similar to fire alarms, were sounding as they entered. William Sywak entered first, holding up his cell phone in what appears to be an effort to document the experience:



Billy Sywak was close behind his father, and also held up his cell phone as he paraded through the halls:



Like the hundreds of other rioters who stormed the building that afternoon, the Sywaks did not submit to any security screening.

After entering the Capitol, the Sywaks turned to the right and walked past the shattered glass on the floor from the smashed-in window. They entered the Crypt, where they were part of a tense standoff between the mob and a team of police officers ill-equipped to hold the mob at bay. *See* Exhibit 6 (Excerpt from documentary film crew footage).



*Excerpt from Exhibit 6*

Billy Sywak stood on a statue's pedestal, filming the stand-off between the rioters and the police.

Video footage recovered from Billy Sywak's text messages appears to be taken from his position

atop that statute's pedestal. The standoff in the Crypt lasted several minutes, but the mob, including

the Sywaks, eventually overcame the police and broke through their line.  As Billy Sywak's video

shows, the crowd chanted, "Stop the Steal! Stop the Steal!" and pressed forward, deeper into the

building, along with the Sywaks. *See* Exhibit 7 (Video in the Crypt, from Billy Sywak's phone).



*Excerpt from Exhibit 7*

The Sywaks spent around 20 minutes inside the Capitol building. They were surrounded by chants such as "Whose House? Our House!" and people forcing their way through police efforts to keep the peace. Billy Sywak left through the Memorial Door on the east side of the building at 2:40 pm, and William Sywak followed just a few minutes after at 2:42 pm, exiting through the same east side door. William slipped out the door just as the police were closing off that point of entry, fighting off rioters on the exterior of the door who were working against the police to try to keep the doors open. William Sywak squeezed his way out through those doors, the last to leave through that door for some time.

It appears the father and son were separated for some time after exiting. Billy made his way back to the West Front, where, at around 2:49, he was seen on body-worn camera re-joining the crowd at the front line. After a scuffle with police occurred right near him and a woman shoved into him, Billy Sywak showed the police officers on the front line his middle finger.



Text messages recovered from Billy Sywak's phone suggest that he was documenting the event using Snapchat, a messaging app that instantly deletes shared content. At 3:03 pm, an associate texted him, "Duuuudeyou rioting??" and Billy Sywak answered, "Fuck yeah you got my snapchat[.]" He followed up with what appears to be a Snapchat username, adding, "Check story out[.]"

Billy Sywak texted his fiancée that he had lost track of his father, and by 4:13 pm William Sywak had not made it back to where they parked the car. Billy's fiancée—presumably watching

footage on TV from New York—was getting worried and advised him to leave because, she said, "it looks like its getting nasty[.]" Billy reassured her, "It was find [sic] I was just in front lines of it all lol[.]" She pushed back, "It was not. It makes us supporters look terrible[.]" She asked him to get home. He declined, saying, "I need to find my dad first an no this election is terrible an they need to know shits gotta be taken seriously.. Them cops started all the shit first spraying us with pepper spray a shooting rubber bullets[.]" At 5:46 pm, she warned him, "News said if people aren't out by 6 they will be arresting[.]"

Billy Sywak reported some of what he had seen that day. At 6:17 pm, when his fiancée told him there had been a shooting inside, he said, "I didn't hear no gun shot only bang grenades." He also said, "Seen some cops get beat up pretty bad tho an a cop got pepper spray really bad[.]" She talked about getting off Facebook, and he said, "Reason I don't go Facebook live too they dont need any of my evidence lol[.]" Her response, again referencing "snap," further suggests that Billy Sywak was using Snapchat to share his experiences but keep it discrete.

Billy Sywak found his father that evening at around 7:00 pm and they drove home, arriving on January 7.  When talking with an associate later that night, Billy Sywak described his feelings about the riot after he had some time to process the events. He said,

> [T]he experience was so intense man. The Things I seen was awsome [sic] people handing me pepper spray to get into the push. Thus [sic] dude had a backpack that had a wand the [sic] sprayed a huge cloud a tear gas. Shit over powered the police pepper spray. I watched some dude spray a cop from 6inches away thru a screen right into a cops eyes. Cop never seen it coming. Ppl were getting pepper sprayed the front line washing there [sic] eyes out an rushing back in to ouch the line some more. The people will not give up an thats what we were showing them the capital is the people house not the governemts they work for us lol

A little after midnight on January 7, 2021, Billy told another associate who reportedly had been at the Capitol as well, "Fuck yeah we made history together an everyone [sic] thinks it's a crime to have been there lol[.]"

*Billy Sywak's Interview and Searches*

In May 2019, agents secured arrest warrants for both Sywaks and warrants to search both of their homes. On May 19, 2021, they approached Billy Sywak at his home, executed the arrest and drove him to the FBI office, where he was advised of his *Miranda* rights. He agreed to an interview, and voluntarily described his trip to D.C. with his father. Billy Sywak admitted that the two had entered the Capitol together, along with a large crowd. Although the video evidence demonstrates otherwise, Billy Sywak claimed that he was unaware that he was not allowed inside the Capitol building at the time. He also claimed that he left immediately when he heard that Capitol Police officers were coming with guns and that someone had been shot. During the interview, he provided agents with the password to his cell phone, which was subject to the search warrant executed that day.

As part of the searches that day, agents recovered both William Sywak's and Billy Sywaks's cell phones. FBI computer technicians analyzed the devices, and cell phone extraction software was used to review the contents. Agents recovered some text messages from Billy Sywak's phone, including remnants of video files that he had attached to text messages sent on January 7, but beyond those attachments they found no stored photos or videos that he took on the afternoon of January 6. From William Sywak's phone, they recovered six video files taken on January 6, but all six were taken before the Sywaks entered the Capitol building. Although both Sywaks can be seen in surveillance footage and open-source video of the riot frequently if not near-constantly using their phones to record or document the scene, agents located only two videos taken inside the Capitol on either of their cell phones—both as text message attachments found on Billy Sywak's phone. (As noted above, Billy Sywak told his fiancée on January 6 that the reason he didn't go live on Facebook was "they dont need any of my evidence lol[.]")

*The Charges and Plea Agreement*

On May 7, 2021, both Sywaks were charged in a single four-count complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G); they were arrested on May 19, 2021. On July 27, 2021, both defendants were charged by four-count Information with the same violations alleged in the criminal complaint, 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On February 2, 2022, both defendants pleaded guilty to Count Four of the Information, charging a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, both defendants agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Billy Sywak now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as

described below, the Section 3553(a) factors weigh in favor of incarceration.

###    A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while assessing Billy Sywak's individual conduct and determining a fair and just sentence, the Court should address a spectrum of critical aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Billy Sywak personally engaged in violence or destruction, he would be

facing additional charges and penalties associated with that conduct. The absence of violent or destructive acts on his part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish him from most other misdemeanor defendants.

Billy Sywak had contemplated violence when he traveled to Washington, D.C. His fiancée encouraged it, and he agreed. The day before, he was "pumped" by his conviction that Trump would not hand over his office in a transition of power. When the riot began and escalated before his eyes, Sywak filming the scene up close from a perch on the northwest scaffolding. He stood in clouds of smoke and flash bang grenades, watching (and filming) as rioters clashed with police on the West Front. This did not discourage him from advancing, and he joined the crowd shoving up the stairs to the Upper West Terrace and on into the building. He was well aware of the violence required to make that entry into the Capitol. Even with the benefit of hindsight, he bragged about his alarming conduct, proudly sharing it with an associate along with his takeaway: "Fuck yeah gotta get right into it!!!!"

The Sywaks entered the building approximately five minutes after it was first breached. While no police officers blocked his path, he had witnessed the police attempting to gain control and protect the doors outside. And there were clear signs of violent entry all around him. The window adjacent to the door through which he passed had just been smashed out. The security alarm was blaring. Tear gas had been deployed. Billy Sywak did not stop there, but walked to the heart of the building behind yet another battle line in the Crypt. He filmed as the crowd pushed forward and chanted, "Stop the Steal!"

Billy Sywak's words and actions after leaving the building show a lack of remorse. He did not leave the premises after he exited the building, instead remaining on restricted grounds as the crowd continued battling with police (and continuing to demonstrate his disrespect for the embattled officers). He claimed the "cops started all the shit first." He reportedly told his fiancée

that the police let him into the building—an outlandish claim that is entirely contradicted by the evidence. And he maintained that false denial when interviewed by the FBI, refusing to take any accountability for his actions and instead implying that the police failed to do enough to stop him. When speaking privately, he showed his true feelings: he rejoiced at the assaults rioters committed against the police, pepper spraying them directly in the eyes from point blank range.

Further, although the evidence suggests that Sywak took a great deal of video footage, that material was never recovered from his phone. He also made comments about protecting "my evidence[.]" In combination, this suggests he may have taken steps to remove evidence from his phone when the consequences of his offense became clear.

### B.  Billy Sywak's History and Characteristics

As set forth in the PSR, Billy Sywak had a supportive and loving upbringing with his single mother. His father (and co-defendant) was not a big part of his life growing up. He finished high school. He met his current fiancée as a teenager. He now works in the welding industry, a job he has held since 2017. He has no criminal history and no prior arrests. He has no reported mental or physical health problems and no issues with drug or alcohol abuse. By all accounts, he has lived a law-abiding and happy life in Western New York, with a close family and plenty of community support.

On January 6, 2021, Sywak's fiancée was pregnant with Billy Sywak's first child, who was born in July 2021. (In fact, as Billy Sywak traveled to D.C., he and his fiancée talked about the pregnancy and suggested the country needed to re-vote and elect Trump for the benefit of their unborn child.)

Immediately after January 6, Billy Sywak celebrated the attack. And when he was interviewed by law enforcement, he minimized his conduct, falsely asserting that the police let him inside the Capitol building. More recently, after the cloud of criminal charges had been

23

hanging above him for several months, he has accepted responsibility for his misconduct. He expressed remorse and regret when speaking with the Probation Officer preparing the Presentence Investigation Report.

In short, Billy Sywak took responsibility, but only after facing charges and only when his comments were targeted to an audience that might help impact his sentence. His stable family life and upbringing make his actions on January 6 all the more confounding. His decision to participate in the riot, knowing in advance that the event might be violent and the National Guard was already making plans to defend the Capitol the night before, should have consequences to ensure Billy Sywak is specifically deterred in the future. Under these circumstances, a sentence of incarceration is appropriate.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov /sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf.

**D. The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

25

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters— especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Billy Sywak's contemporaneous messages during and immediately following the riot, his eagerness to get back to the front of the violent crowd even after leaving the Capitol building, and his attempt to minimize his conduct, demonstrate the need for specific deterrence for this defendant. Billy Sywak celebrated the violence of the day and the very real damage caused or threatened upon hundreds of law enforcement officers when he texted his friend to describe how "awsome" the things he saw there were, including "people handing me pepper spray to get into the push" and the fact that the mob overpowered the police and "[c]ops never seen it coming."

He used the riot as his opportunity to send a message to lawmakers (in his words, that "[t]he people will not give up" and "the capital is the people house not the government they work for us lol"). The sentence in this case should send a message to Billy Sywak in return: that a peaceful democratic society does not tolerate his behavior or his purpose on that day. A sentence of incarceration will serve that important need.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

The government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault

on law enforcement officers, to conspiracy to corruptly interfere with Congress.[4] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[5]

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long

---

[4] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

he or she remained inside, the nature of any statements made (on social media or otherwise), whether the defendant destroyed evidence of participating in the breach, etc.—help explain the differing recommendations and sentences. Avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity in lower sentence for codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Of course, any assessment of disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id.*; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the

use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court may consider the following similarly situated defendants for reference:

- *United States v. Joshua Wagner*, 21-cr-310-ABJ, Dkt. No. 72. Wagner was sentenced to 30 days in custody for his participation in the riot. He entered the Capitol through the broken window next to the Senate Wing Door where the Sywaks entered. He disregarded instructions from the police and joined the crowd in chants. Just days after the riot, when he learned he was under investigation, Wagner expressed regret and a willingness to cooperate, and quickly accepted responsibility. Unlike here, there is no evidence that Wagner expressed satisfaction with his conduct on January 6 in the days following the event.

- *United States v. Jean Lavin*, 21-cr-596-BAH, Dkt. No. 72, at 5. Like Billy Sywak, Lavin traveled to D.C. for the events of January 6 with her mother, and while she did not engage in any acts of violence, she witnessed them on her way to illegally enter the U.S. Capitol through the Senate Wing Door just a few minutes after the Sywaks entered. She likewise stood with the mob in the Crypt that ultimately overpowered the police there. And, like Billy Sywak, she minimized her misconduct in her later interview with the FBI, claiming that police allowed her to go inside. She was sentenced to serve 10 days in custody over the course of five weekends, and 36 months of probation.

- *United States v. Glenn Croy*, 21-cr-162-BAH, Dkt. No. 58. Similar to the

Sywaks, Croy witnessed, but did not participate in, violence as he made his way through the West Plaza up to the Senate Wing Doors. He entered at around the same time the Sywaks entered, and joined the rioters, including the Sywaks, in the Crypt. He filmed the events as they unfolded, and later shared on social media that he had "stormed the Capitol." He was sentenced to 14 days in custody of community confinement, three months of home detention, and 36 months of probation.

Here, the Court should also consider the sentence to be imposed on Billy Sywak's father and co-defendant, William Sywak. As of the filing of this memorandum, both Sywaks are scheduled to be sentenced simultaneously. They participated in the riot together and engaged in much of the same conduct. There are some important differences between the father and son. Billy Sywak's conduct on January 6 was more egregious than William's; he climbed scaffolding, and remained on the grounds at the front line, engaging with police even after he was ejected from the building. And later, when talking with friends, he boasted about his participation in the riot, celebrated the trauma imposed on the police trying to regain order, and shared video of the event with others. He discussed his desire to prevent law enforcement from finding evidence of his crimes. On the other hand, William Sywak's case is aggravated in other ways. He lied to the FBI after the events, fully denying that he had even entered the building. And William Sywak's lengthy criminal history demonstrate the need for a sentence of incarceration to achieve the goals of sentencing. Based on these comparative factors, in a concurrently-filed memorandum the government is recommending a slightly lesser term of 30 days incarceration for William Sywak.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095.

## V.    The Court's Lawful Authority to Impose a Split Sentence

A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense. *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Sarko*, 21-cr-591 (CKK), ECF 37 (D.D.C. April 29, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### A.    A sentence imposed for a petty offense may include both incarceration and probation.

#### 1.    *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains

31

the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[6] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[7] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant

---

[6] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10). *See* Part II *infra*.

[7] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3).

## 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result"

could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at

808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense"). Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense." *See Little*, 2022 WL 768685,

at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Id.* This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented." *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*,

490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

**B. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.**

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to

impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[8]

A sentencing court may impose one or more intervals of imprisonment up to a year (or the statutory maximum) as a condition of probation, so long as the imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. § 3563(b)(10). Although the statute does not define an "interval of time," limited case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above and reversing magistrate's sentence that included 30-day period of confinement as a condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two weeks' imprisonment served in one continuous term followed by a period of probation is permissible under Section 3563(b)(10).[9]

---

[8] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

[9] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison. Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation. 18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in this case.

## VI.  Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, those factors support a sentence of incarceration. The government recommends that this Court sentence William "Billy" Jason Sywak to 45 days' incarceration, 3 years' probation, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by recognizing the seriousness of the offense and the combination of aggravating and mitigating characteristics of the defendant.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    /s/ *Emily W. Allen*
EMILY W. ALLEN, Cal. Bar No. 234961
Assistant United States Attorney
555 Fourth Street, N.W.
Washington, DC 20530
emily.allen@usdoj.gov
(907) 271-4724

40